UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

LENORA KINCHEN,

                Plaintiff,                **MEMORANDUM & ORDER**
                                          17-CV-3244 (MKB)

              v.                          17-CV-4409 (MKB)

ST. JOHN'S UNIVERSITY, CONRADO
"BOBBY" GEMPESAW, BERNARD M. TRACY,
KATHLEEN MCELROY, JOSPEH OLIVA,
CYNTHIA FICO SIMPSON, KATHRYN
HUTCHINSON, DENISE HOPKINS, PAULETTE
GONZALEZ, JANE DOE and JOHN DOE OF THE
NEW YORK CITY DEPARTMENT OF FINANCE,

                Defendants.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Lenora Kinchen, proceeding *pro se*, commenced the above-captioned action on

June 1, 2017, against Defendants St. John's University ("SJU"), Conrado "Bobby" Gempesaw,

Bernard M. Tracy, Kathleen McElroy, Joseph Oliva, Cynthia Fico Simpson, Kathryn

Hutchinson, Denise Hopkins, Paulette Gonzalez,[1] and Jane and John Doe of the New York City

Department of Finance. (Compl., Docket Entry No. 1.) On March 16, 2018, Plaintiff filed an

Amended Complaint against Defendants alleging violations of the Stored Communications Act,

---

[1] Plaintiff also filed a separate, identical action naming only Defendant Gonzalez. Am. Compl., *Kinchen v. Gonzales*, No. 17-CV-4409, Docket Entry No. 11 (E.D.N.Y. Mar. 16, 2018). Because that action raises the same causes of action against Gonzalez, does not raise additional allegations, and no useful purpose would be served by litigation of that action, the Court dismisses the action as duplicative. *See Kanciper v. Suffolk Co. Soc. for the Prevention of Cruelty to Animals, Inc.*, 722 F.3d 88, 92–93 (2d Cir. 2013) ("As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." (quoting *Curtis v. Citibank*, N.A., 226 F.3d 133, 138 (2d Cir. 2000))).

18 U.S.C. § 2701 *et seq.* ("SCA"), the Federal Wiretap Act, 18 U.S.C. § 2510 *et. seq.* ("FWA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and Articles 120.45 and 175 of the New York Penal Law, as well as asserting claims for defamation, negligent and intentional infliction of emotional distress, and breach of contract. (Am. Compl., Docket Entry No. 16.) Plaintiff alleges that Defendants breached her employment contract, violated federal wiretap laws, unlawfully surveilled her electronic communications, intentionally and negligently inflicted emotional distress upon her, and defamed her. (*See generally* Am. Compl.)

Currently before the Court is Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. (Defs. Mot. to Dismiss ("Defs. Mot."), Docket Entry No. 20); Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 22.) Plaintiff opposes the motion. (Pl. Affirmation in Opp'n to Defs. Mot. ("Pl. Opp'n"), Docket Entry No. 25.) For the reasons discussed below, the Court grants Defendants' motion and grants Plaintiff leave to file a second amended complaint within thirty (30) days of this Memorandum and Order.

## I.  Background

The Court assumes the truth of the factual allegations in the Amended Complaint for the purposes of this Memorandum and Order. In light of Plaintiff's *pro se* status, the Court also considers and assumes the truth of the factual allegations in Plaintiff's opposition.[2]

---

[2] *See Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) (finding that district courts may consider factual allegations made by a *pro se* party in his papers opposing a motion to dismiss); *see also Trisvan v. Heyman*, 305 F. Supp. 3d 381, 389 (E.D.N.Y. 2018) (same).

### a. Plaintiff's employment and interactions with Gonzalez and others

On or about June 10, 2013, SJU hired Plaintiff as its Director of Employer Relations. (Am. Compl. ¶ 19.) During Plaintiff's employment, she "performed duties in an exemplary fashion[,] exceeding expectations set forth in the job description and consistently out-performed team members." (*Id.* ¶ 24.) For example, Plaintiff brought several "prestigious employers on campus for the first time" and crafted unique internship opportunities for students. (*Id.* ¶¶ 25–26.)

On or about April 29, 2015, Hopkins "announced via email that [Gonzalez] would be joining Career Services on or about May 16, 2015 to assume the position of Senior Director of Employer Relations at [SJU] replacing Judith Courtney." (*Id.* ¶ 28.) Plaintiff alleges that Hopkins hired Gonzalez "in violation of internal human resources policies in that the position was not advertised,"[3] and as a result, SJU denied her the opportunity to apply for the position. (*Id.* ¶ 29.)

Further, Plaintiff alleges that Gonzalez "launched a well-crafted slander campaign against Plaintiff" by "immediately [building] an internal regime against Plaintiff by manufacturing false allegations" and "aggressively usurping Plaintiff's work and clients." (*Id.* ¶ 32.) When Plaintiff met Gonzalez for the first time, Gonzalez told her "I can't wait to learn everything you know." (*Id.* ¶ 36.) Gonzalez also made a comment "related to contacting Plaintiff's former employers," which Plaintiff felt was an invasion of privacy and a form of intimidation. (*Id.*) In addition,

---

[3] According to Plaintiff, SJU's hiring policy states that "the hiring manager must complete a Notice of Vacancy (NOV) form to initiate a new hire process. Human Resources Function is to coach and assist hiring managers to fill open positions, coordinate internal transfers and offer guidance with advertising." (Pl. Opp'n 4.) In addition, Plaintiff alleges that "Policy 105 – Job Posting" states "in a continuing effort to encourage and promote professional growth of our employees, open positions are generally posted on the internal career portal." (*Id.* at 4–5.)

Plaintiff alleges that Gonzalez manipulated, interrogated, intimidated, bullied, and was hostile toward Plaintiff in order to "destabilize Plaintiff." (*Id.* ¶ 32.) Plaintiff contends that through "both libelous and slanderous communications that were shared with senior management and implied with employees, students and external clients," Gonzalez portrayed Plaintiff as "incompetent, dishonest, unethical, unprofessional, unreliable and unqualified." (*Id.* ¶ 34.) As a result, Plaintiff felt "hunted," which turned Plaintiff's work environment into "a workplace of extreme discomfort, terror and fear of loss of employment for no reason." (*Id.* ¶ 33.)

At some point after Gonzalez arrived at SJU, Hopkins "summoned the team to the conference room to inquire of who was looking into Gonzalez's LinkedIn page," and threatened employees with reprimand for looking into the page. (*Id.*)

On or about June 15, 2015, Plaintiff took a one-week vacation, and, prior to departing, informed Gonzalez and Hopkins "that she would not be available via email" but that they "could reach her on her cell phone for urgent matters." (*Id.* ¶ 39.) Also on June 15, 2015, Plaintiff submitted performance objectives for the 2014/2015 performance cycle and completed a "self-appraisal of the Partnership for Performance (PFP) form."[4] (*Id.* ¶ 57.) When Plaintiff returned from vacation a week later on June 23, 2015, Gonzalez sent her a text message at 5:30 PM stating that "Grant Thornton,[5] third party consultants, would be in the office at 9:30 [AM] on

---

[4] The PFP form is an internal form between an employee and her supervisor, which tracks the employee's performance and objectives for the previous year. (Am. Compl. ¶¶ 57–58, 61–62.)

[5] Plaintiff alleges that Grant Thornton served in a "dual capacity creating a conflict of interest" because it served as external consultants to the Career Services Department at SJU and as the client of Patrick Holton, Career & Internship Advisor, who was later promoted to Director of Employer Relations at SJU's business school. (Am. Compl. ¶ 47.)

June 24, 2015." (*Id*. ¶ 40.) Plaintiff "received no further telephone call, information or instruction." (*Id*.)

The next day, Plaintiff "discovered that Hopkins and Gonzalez sent an official notification email in advance to team members the morning of June 23, 2015, with detailed instructions" for the June 24th meeting.[6] (*Id*. ¶ 41.) Plaintiff asked Hopkins why she was not given advance notice of the meeting via cellular telephone while on vacation, and Hopkins told her "if you are on top of your game, you have nothing to worry about." (*Id*. ¶ 42.) During the meeting, the consultants were "very cold and calculating towards Plaintiff" and used "racial epithets" including a reference to Plaintiff meeting clients "at a water fountain." (*Id*. ¶ 44.) Plaintiff alleges that this "statement came across with the sentiment of Jim Crow racism." (*Id*.)

Plaintiff alleges that Grant Thornton's actions in creating "performance objectives for Plaintiff and team members" was a violation of the PFP policy because the policy dictates that objectives are to be created by employee and supervisor. (*Id*. ¶ 47.) In addition, Plaintiff alleges that the "process by which the performance objectives were created for the 2015/2016 performance cycle upon Gonzalez's arrival was not in alignment with the performance appraisal policies of [SJU]" and were not "objectives created in the manner that Plaintiff's former objectives were created prior to Gonzalez's arrival." (*Id*. ¶ 50.)

On July 13, 2015, after reviewing Plaintiff's PFP form self-assessment, Hopkins emailed Plaintiff and asked her to prepare for a "realistic evaluation." (*Id*. ¶ 58.) On July 22, 2015,

---

[6] Gonzalez's email instructed employees to attend the meeting prepared to discuss "what is working well, what are gaps or challenges, and [the employees'] ideas for future operation" and instructed directors to bring their portfolios to the meeting for review. (*Id*. ¶ 41.) Plaintiff alleges that Grant Thornton "appeared to be part of the overall scheme 'to learn everything Plaintiff knows' with the intention to terminate Plaintiff's employment." (*Id*. ¶ 45 (emphasis omitted).)

Hopkins indicated to Plaintiff that she had not revised her self-assessment, which Plaintiff understood to mean "that Hopkins was not acknowledging Plaintiff's" achievements. (*Id*.)

In July of 2015, Hopkins and Gonzalez met with Plaintiff to review and discuss Plaintiff's PFP form. (*Id*. ¶ 59.) Hopkins asked Plaintiff why she continued to manage certain accounts, which Plaintiff had been working closely with since 2013. (*Id*.) Plaintiff alleges that Gonzalez and Hopkins sought to transfer Plaintiff's accounts to Donna Haynes, thus "usurping Plaintiff's work efforts." (*Id*.) Plaintiff also alleges that Hopkins allowed Gonzalez to be in charge of Plaintiff's performance cycle "for a timeframe in which Gonzalez" was not yet supervisor, which was in violation of SJU policy. (*Id*. ¶ 62.)

On July 30, 2015, Plaintiff notified Hopkins that her PFP had been altered. (*Id*. ¶ 67.) Plaintiff alleges that her final PFP was materially altered, and the alterations "omitted or changed the essence of the words that Plaintiff used to describe her performance and took away from Plaintiff's ability to achieve the results that she already had accomplished." (*Id*. ¶ 65.) Plaintiff requested to meet and review the changes with Hopkins before she signed the PFP. (*Id*. ¶ 68.) However, Hopkins made it difficult to meet, and Plaintiff was "forced to sign the PFP" without discussing it with Hopkins. (*Id*. ¶¶ 68–70.)

Plaintiff alleges that Gonzalez misrepresented a communication she had with Plaintiff regarding a transition of responsibilities to Daisy Saldana, Career & Internship Advisor at SJU. (*Id*. ¶¶ 79–84.) She alleges that Gonzalez "blatantly lied and falsely stated that Plaintiff agreed to hand[]over all efforts to include programming and partnerships to" Saldana. (*Id*. ¶ 83.) Because of Gonzalez's actions, Plaintiff's contact at the United States Department of Veteran Affairs stopped communicating with her. (*Id*. ¶ 89.) Gonzalez then informed Hopkins that Plaintiff was engaging in insubordination by failing to provide Saldana with her initiatives

relating to veteran affairs.. (*Id*. ¶ 90.)

Plaintiff subsequently requested a meeting with Hopkins, Gonzalez, and a representative from human resources. (*Id*. ¶ 91.) Plaintiff met with Hopkins and Gonzalez, but Simpson from human resources did not attend the meeting; Plaintiff alleges that Simpson "deemed the meeting a management issue."[7] (*Id*. ¶ 92.) At the meeting, Hopkins accused Plaintiff of "alleged insubordination, failure to follow instructions and accused Plaintiff of a host of other negative behaviors that totally defamed Plaintiff's character." (*Id*. ¶ 93.)

In or about August or September of 2015, Plaintiff requested a meeting with Gempesaw, President of SJU, to report her concerns with regard to the events that were occurring. (*Id*. ¶ 97.) Gempesaw informed McElroy, Senior Counsel at SJU, of Plaintiff's concerns. (*Id*. ¶ 99.) In or about September of 2015, Plaintiff met with McElroy, and McElroy "agreed to investigate Plaintiff's concerns." (*Id*.) McElroy referred Plaintiff to Oliva, who told Plaintiff "in a confidential manner" that Plaintiff would be transferred to a different department at SJU, but this transfer never occurred, causing Plaintiff to "suffer further harm under Gonzalez." (*Id*. ¶¶ 155–57.) McElroy failed to investigate Plaintiff's concerns and resigned as counsel in January of 2016.[8] (*Id*. ¶ 99.)

On May 3, 2016, Plaintiff met with Oliva to discuss Plaintiff's concerns. (*Id*. ¶¶ 157–58.) Oliva agreed to "investigate, mitigate, and transfer Plaintiff to another department," but informed Plaintiff that "we're not firing Gonzalez." (*Id*. ¶ 158.) Plaintiff alleges that despite her written

---

[7] Plaintiff also alleges that Simpson became "complicit in the unlawful behavior." (*Id*. ¶ 92.)

[8] Plaintiff also alleges that McElroy indicated "that she investigated and there was no evidence of discrimination." (*Id*. ¶ 154.) However, Plaintiff informed McElroy that she had not raised a claim of discrimination. (*Id*.)

notifications to Oliva and Gempesaw that the "violations were grossly affecting Plaintiff's health," Defendants ignored Plaintiff's letters. (*Id.* ¶ 160.) In addition, Plaintiff also alleges that Defendants' actions caused Plaintiff's blood pressure to rise to "triple digits causing her to take increased medications." (*Id.*)

### b. Computer issues and alleged interference

In or about December of 2015, Plaintiff "archived a large volume of data" before going on vacation. (*Id.* ¶ 106.) At some point during her vacation, Plaintiff's "computer was breached" and "all of Plaintiff's work efforts from the year 2015 were wiped clean from Plaintiff's server." (*Id.*) Upon returning from vacation in January of 2016, Plaintiff reported the breach to Information Technology ("IT") and, after numerous telephone calls and emails to IT, Plaintiff "requested a deeper dive with Network Administration." (*Id.* ¶ 107.) IT was able to recover Plaintiff's emails, but they could not explain where the emails went. (*Id.*) Plaintiff reported the breach to McElroy but did not receive any response. (*Id.* ¶ 108.)

In addition to the breach of her computer resulting in the removal of data relating to Plaintiff's work from 2015, Plaintiff alleges that "emails that were shared between McElroy and Plaintiff appeared to be intercepted while in transit." (*Id.*) Plaintiff noticed that Gonzalez would send "retaliatory emails" every time Plaintiff "was in the process of or completing an email to McElroy." (*Id.*) Plaintiff stored email communications with McElroy on her "laptop[9] that were considered personal, confidential and privileged communication[s] between Plaintiff and General Counsel." (*Id.* ¶ 109.) In addition, Plaintiff alleges that "it was a fact that someone had access to Plaintiff's computer and was sitting on Plaintiff's computer while she was on it at all times from

---

[9] It is unclear whether Plaintiff is referring to her work computer or personal laptop. Plaintiff states that SJU kept her laptop after her termination, suggesting that the laptop belonged to SJU. (*Id.* ¶¶ 140–44.).

this point forward." (*Id.*)  When Plaintiff asked Robert Soto, an IT representative, if someone was on her computer, Soto told her that "this request would require way up the chain approval." (*Id.* ¶ 110.)  Plaintiff contends that "it was a fact that someone had granted this access, unbeknownst to Plaintiff," and that this person was disrupting Plaintiff's partnerships with her clients "through electronic means." (*Id.* ¶¶ 110–11.)  During this time, a list of Plaintiff's contacts "disappeared." (*Id.* ¶ 112.)  Because of this alleged interference, Plaintiff "could no longer trust that her clients were receiving her emails." (*Id.* ¶ 111.)

After Plaintiff reported the computer breach to IT, she "discovered an external white wire . . . that was hanging from the roof of SJU extending downward on the exterior of the building and entering into Plaintiff's office through the window." (*Id.* ¶ 119.)  Plaintiff also noticed that a light in a telephone closet next to Plaintiff's office that had always been off was now turned on, and she confirmed with her cellular telephone provider that her cellular telephone had been "cloned." (*Id.* ¶ 120.)  Although Plaintiff's cellular telephone worked fine while she was in SJU's parking lot, it began to "scramble data" when Plaintiff stepped into her office. (*Id.*)  Plaintiff filed a police report and an NYPD former Counter Intelligence Officer told her that "it was best to change the device." (*Id.*)  Plaintiff's cellular telephone provider sent Plaintiff a new phone. (*Id.*)

Plaintiff reported the hanging wire to IT and to SJU's General Counsel. (*Id.* ¶ 121.)  Subsequently, a telecommunications employee went to Plaintiff's office to view the hanging wire but could provide no explanation as to why the wire was there. (*Id.*)  The next day, the wire was still hanging outside the building but was cut so that it was no longer entering Plaintiff's office window. (*Id.*)  Plaintiff discussed the hanging wire with Oliva who told Plaintiff, "I used to think there was an electronic footprint too until I came to St. Johns." (*Id.* ¶ 163.)

Plaintiff also discovered that an email she sent to Gempesaw and McElroy had been altered, and she informed Oliva of this alteration. (*Id.* ¶¶ 123–24.) Oliva requested to see the email, but "each time Plaintiff reached out to Oliva to share the email, Oliva did not respond and the email was never reviewed." (*Id.* ¶ 124.)

On or about January 27, 2015, Plaintiff's personal email account was "compromised" and "phishing emails with porn related language" were sent to Plaintiff's former employers via email. (*Id.* ¶ 125.) Plaintiff had never before experienced a breach of this kind. (*Id.*)

Plaintiff alleges that, beginning on December 15, 2015, she began experiencing "major issues on her computer," including emails that would open by themselves, screens that would pop up as Plaintiff was drafting emails, and other glitches. (*Id.* ¶ 137.)

### c. FMLA leave allegations

On or about July 27, 2016, Plaintiff took medical leave under the FMLA. (*Id.* ¶ 127.) Plaintiff alleges she had to take FMLA leave "due to the constant harassment and violations" she faced at work. (*Id.* ¶ 192.) Plaintiff asserts that she informed Gonzalez that job-related stress was "making Plaintiff physically ill," but that Gonzalez "never acknowledged" this. (*Id.* ¶ 206.) Gonzalez did not inform other employees of Plaintiff's medical leave for at least thirty days. (*Id.* ¶ 192.)

While on medical leave, Plaintiff received a "brown envelope . . . with no name only to include Career Services" at her home. (*Id.* ¶ 179.) Plaintiff questioned Simpson about his actions in giving her home address to others and Simpson told Plaintiff, "I do not need your consent to give out your address." (*Id.*)

On July 28, 2016, Plaintiff received notification that someone had tampered with her

private email.[10]  (*Id*. ¶ 127.)  On August 28, 2016, Plaintiff attempted to access her work

voicemail, but was unable to do so because Gonzalez and another employee changed Plaintiff's

password on or about August 24, 2016.  (*Id*. ¶¶ 128–29.)  Gonzalez also deleted two voicemail

messages Plaintiff had left on her work telephone prior to taking medical leave.  (*Id*. ¶ 130.)

Plaintiff changed her voicemail password, but "Gonzalez or someone" immediately changed the

password.  (*Id*. ¶ 131.)

### d.  Plaintiff's return from FMLA leave

In October of 2016, when Plaintiff returned from FMLA leave, she noticed a "call

forwarding mechanism" on her office telephone.[11]  (*Id*. ¶ 133.)  Employees from SJU's

Telecommunications department did not recognize the device.  (*Id*.)  On Plaintiff's first day back

at work after her FMLA leave, a colleague asked Plaintiff "in a joking[] manner 'are you coming

back,'" which caused Plaintiff to feel insulted because "Gonzalez's messages" made it seem as if

Plaintiff abandoned her job.  (*Id* ¶ 193.)

In addition, Plaintiff's employer portfolio was "completely dismantled."  (*Id*. ¶ 195.)

Gonzalez had taken William Murphy, a career and internship advisor, on visits to Plaintiff's

clients, giving clients the impression that Plaintiff "was gone" and Murphy "had taken Plaintiff's

position."  (*Id*.)  Further, a fellow SJU employee told Plaintiff that "Murphy and other colleagues

were irritated that [Plaintiff] returned from FMLA [leave], personnel changes had to be made

because you were not supposed to come back."  (*Id*. ¶ 199.)  Plaintiff's clients contacted her

---

[10]  Plaintiff does not identify who notified her, how she was notified, or who breached her personal email account.

[11]  Plaintiff's own research revealed that the device "allowed a person to forward the extension to any phone at any time."  (Am. Compl. ¶ 133.)

asking if she was "still working" and their communication gave Plaintiff the impression that her clients believed she had been "out on disciplinary action." (*Id.*)

Plaintiff alleges that in contrast to her experience while on FMLA, Patrick Holton, another employee who went on medical leave, was able to keep his "client relationships . . . intact," was able to retain his position and was later promoted, and the "employees were aware of his FMLA leave." (*Id.* ¶ 194.)

On or about March 6, 2017, Plaintiff's doctor requested that she go to the emergency room because of her blood pressure, but Plaintiff declined to go out of fear of negative treatment from Gonzalez if Plaintiff missed work. (*Id.* ¶ 214.)

### e. Plaintiff's termination

On March 31, 2017, SJU terminated Plaintiff's employment. (*Id.* ¶ 140.) "Gonzalez summoned Plaintiff to human resources with no explanation," and Plaintiff requested a notification from human resources that she should appear. (*Id.* ¶ 221.) While awaiting notification of her human resources appointment from Simpson, Plaintiff remained in her office, where "Gonzalez, Simpson and two Public Safety officers" came in, and then, "[w]ith the door open and students and employees present," Gonzalez "stated 'you did not come to us so we came to you,'" and stated "'you are terminated' and left Plaintiff's [o]ffice." (*Id.* ¶ 222.) When Plaintiff requested that they close the door and talk about the reason for her termination, "Simpson stated 'I am not getting into this with you[]. Your behavior and performance is why.'" (*Id.*) Plaintiff was then "escorted off the property." (*Id.* ¶ 225.)

After the termination, Simpson informed Plaintiff that he would hand over her computer to IT but, as of April 10, 2017, IT was not aware of Plaintiff's termination and Plaintiff's work email remained active. (*Id.* ¶¶ 140–41.) Plaintiff alleges that Gonzalez had full access to her

work email.  (*Id.* ¶ 144.)  On or about April 21, 2017, Plaintiff's email "was sending out a message indicating that she is no longer employed by [SJU] along with other language that put[] Plaintiff in a false light."  (*Id.* ¶ 142.)

In an attempt to "mitigate the situation," Plaintiff applied to a position in SJU's law school.  (*Id.* ¶ 176.)  Plaintiff felt humiliated during the interview because one of the interviewers spoke down to her "as if she was incompetent."  (*Id.*)  Plaintiff alleges that it was clear the interviewers knew of her situation and interviewed her solely as a formality.  (*Id.*)

## II.  Discussion

### a.  Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor."  *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.

### b.  Stored Communications Act claim

Defendants argue that Plaintiff's claim under the Stored Communications Act fails

because the allegations do not assert that any of the individual Defendants intentionally accessed Plaintiff's computer without authorization, fails to identify who accessed her computer, and fails to allege that "whoever accessed her computer" did so without authorization.  (Defs. Mem. 9.)

Plaintiff alleges that her computer was "breached" and all her "work efforts from the year 2015 were wiped clean from Plaintiff's server,"[12] but that days later the emails were recovered and placed back on Plaintiff's server.  (Am. Compl. ¶¶ 106–07.)  In addition, Plaintiff alleges that email communications between her and McElroy were "intercepted" because she "noticed a pattern of receiving retaliatory emails from Gonzalez every time [she] was in the process of or completing an email to McElroy."  (*Id.* ¶ 108.)  Further, Plaintiff alleges that Gonzalez was not authorized to access Plaintiff's work voicemail, which contained private, stored communications.  (Pl. Opp'n 11.)  Lastly, Plaintiff contends that her "personal email account had been compromised," (Am. Compl. ¶ 125), her cellular telephone was "cloned," and her cellular telephone "began to scramble data" whenever she was at her office, but not when she was outside, (*id.* ¶ 120).

The SCA is an addition to Title II of the Electronic Communications Privacy Act of 1986 ("ECPA").  *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir. 2006).  The SCA imposes both criminal and civil sanctions against:

> [W]hoever — (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system . . . ."

*See* 18 U.S.C.S. § 2701(a).  Congress created a private right of action for "any . . . person

---

[12]  Plaintiff appears to be referring to email communications on her work computer. (Am. Compl. ¶ 106.)

aggrieved" by an intentional violation of section 2701(a). 18 U.S.C. § 2707; *see Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 875 (9th Cir. 2002)) ("The legislative history of the [SCA] suggests that Congress wanted to protect electronic communications that are configured to be private."); *Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14-CV-6498, 2017 WL 1215753, at *8 (S.D.N.Y. Mar. 31, 2017) ("The SCA creates a civil cause of action for damages. . . .'" (internal citations and quotation marks omitted)); *MDB LLC v. Hussain*, 14-CV-9281, 2016 WL 1267793, at *8 (S.D.N.Y. Mar. 29, 2016) (stating that the SCA "aims to prevent hackers from obtaining, altering or destroying certain electronic communications"); *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008) (finding that the SCA creates a private right of action against anyone who "accesses an electronic communication, or obtains an electronic communication while it is still in electronic storage, without authorization").

However, the SCA "does not apply with respect to conduct authorized . . . by the person or entity providing a wire or electronic communications service." 18 U.S.C.A. § 2701(c)(1). Pursuant to this exception, courts in this circuit have held that employers may access the stored electronic communications of their employees because such access does not exceed the employers' authority. *See Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 607 (S.D.N.Y. 2015) (holding that an employer who accessed a former employee's emails was not "without authorization," and had not "exceeded their authorization to access [the employee's] emails"); *Freedom Calls Foundation v. Bukstel*, No. 05-CV-5460, 2006 WL 845509, at *27 (E.D.N.Y. Mar. 3, 2006) (finding that Title II exempts from liability seizures of communications authorized "by the person or entity providing a wire or electronic communications service" (quoting § 2701(c)(1))); *see also Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107 (3d Cir. 2003) (holding

that because the employee's email was stored on the employer's system, the search of emails falls within the 18 U.S.C. § 2701(c) exception).

An "[e]lectronic communication service" is "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15). "Examples include telephone companies and e-mail service providers."  *Council on Am.–Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 334 (D.D.C. 2011) (citing S.Rep. No. 99–541, at 14 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568; H. Rep. No. 99–647, at 37 (1986)).  The language of the statute also "captures any service that stands as a 'conduit' for the transmission of wire or electronic communications from one user to another." *Id*. (quoting *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 902 (9th Cir. 2008)).

 "Electronic storage" is defined as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and . . .  any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17)(A)–(B); *see In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 512 (S.D.N.Y. 2001) (finding that communications in "electronic storage" are those temporarily stored by electronic communication services incident to their transmission, "for example, when an e-mail service stores a message until the addressee downloads it").

### 1.  Plaintiff fails to state a claim as to her work-related communications

Plaintiff alleges that Defendants breached her computer because all of her "work efforts" from 2015 "were wiped clean from [her] server."  (Am. Compl. ¶ 106.)  Plaintiff reported the breach to IT and they were able to recover Plaintiff's emails and "place them back on the server."  (*Id*. ¶ 107.)  Plaintiff also alleges that her communications with McElroy "appeared to

be intercepted while in transit" because she would receive emails from Gonzalez when Plaintiff was "in the process of or completing an email to McElroy." (*Id.* ¶ 108.)

Plaintiff concedes that SJU was authorized to access her work, including communications stored on her laptop. (Pl. Opp'n 11.) Because employers, as providers of an electronic communications service, have authority to access employees' work email and work computer, Plaintiff has not shown that she has a valid SCA claim against Defendants for breaching her "work efforts" and work communications on her work computer or company email. *See MDB LLC*, 2016 WL 1267793, at *8 (dismissing the plaintiff's SCA claim where the plaintiff failed to allege how the employer exceeded its authorization or acted without authorization in accessing or restricting the plaintiff's email accounts and databases); *Freedom Calls Found.*, 2006 WL 845509, at *27 (finding that an employer has the right "to 'intercept,' that is, receive and review future e-mails . . . so long as it does so in the normal course of business, because . . . monitoring is necessary to ensure that current and prospective [s]upporter and [c]lient email messages are answered in a timely fashion").

In addition, as to Plaintiff's emails with McElroy,[13] Plaintiff does not allege that those emails were in storage as required by the SCA. Rather, Plaintiff alleges that the emails were "intercepted while in transit." (Am. Compl. ¶ 108.) Regardless, because Plaintiff fails to identify who allegedly accessed her "electronic communications" and fails to allege that Defendants acted without authorization to do so, the allegations are insufficient to state a claim. *See Williams*, 136 F. Supp. 3d at 606 (dismissing the plaintiff's SCA claim because he "does not

---

[13] Although Plaintiff alleges that these email communications were personal and confidential, the email at issue appears to have been sent from Plaintiff's work computer because she contacted SJU's information technology department to notify them of her belief that someone was accessing her computer without authorization. (Am. Compl. ¶ 109.)

allege, other than in conclusory terms, that the defendants were without authorization, or exceeded their authorization to access his emails").

## 2. Personal cellular telephone and email

Plaintiff alleges that her personal cellular telephone was cloned and that it began to "scramble data" when she walked into her office. (Am. Compl. ¶ 120.) She also alleges that on or about January 27, 2015, "around the same time [her] cell phone appeared to be cloned while in her office," Plaintiff "discovered that her personal email account had been compromised" because "phishing emails with porn related language" were sent from her personal email account to former employers. (*Id*. ¶ 125.)

The SCA prohibits the intentional access of a "facility" without authorization. 18 U.S.C.A. § 2701(a)(1). The Second Circuit has not yet ruled on whether a personal cellular telephone is a "facility" under the SCA, but courts that have examined the issue have determined that personal cellular telephones fall outside the scope of the SCA. *See In re Nickelodeon Consumer Privacy Litig.,* 827 F.3d 262, 277 (3d Cir. 2016) (finding that "personal computing devices were not protected 'facilities' under the statute"); *Garcia v. City of Laredo, Tex*., 702 F.3d 788, 790 (5th Cir. 2012) (concluding that the SCA "does not apply to data stored in a personal cellular telephone").

The Court declines to decide this issue because, even assuming that a personal cellular telephone is a "facility" under the SCA, and although Plaintiff names multiple individual Defendants, Plaintiff does not plead sufficient factual allegations to plausibly allege that any named Defendant cloned her personal cellular telephone, or that any of the named Defendants accessed any of Plaintiff's stored communications on her personal cellular telephone without authorization.

In addition, although courts in this Circuit have found that the employer exception does not authorize employers to access an employee's personal email account, *see Cohen v. Casper Sleep Inc.*, No. 17-CV-9325, 2018 WL 3392877, at *5 (S.D.N.Y. July 12, 2018) (finding that "[j]udges in this [d]istrict routinely hold that communications stored on personal devices are not held in electronic storage" for purposes of the SCA); *Pure Power Boot Camp*, 587 F. Supp. 2d at 555 (finding that the employer's access to the plaintiff's personal Hotmail account violated the SCA), Plaintiff does not provide any facts to plausibly allege that any of the Defendants intentionally accessed her personal email account without authorization.  Plaintiff therefore fails to state a claim under the SCA.  *See Tantaros v. Fox News Network, LLC*, No. 17-CV-2958, 2018 WL 2731268, at *10 (S.D.N.Y. May 18, 2018) ("[V]ague, speculative, and conclusory allegations concerning malware allegedly found on [the plaintiff's] personal computer and [the defendant's] purported ability to access or monitor communications on [the] [p]laintiff's Blackberry are insufficient to state such a claim."); *Yukos Capital S.A.R.L. v. Feldman*, No. 15-CV-4964, 2016 WL 4940200, at *3 (S.D.N.Y. Sept. 14, 2016) (dismissing the plaintiff's SCA claim where the plaintiff's allegations did not implicate any of the named defendants); *see also See Molefe v. Verizon New York, Inc.*, No. 14-CV-1835, 2015 WL 1312262, at *3 (S.D.N.Y. Mar. 24, 2015) (dismissing claim under the SCA where the plaintiff "provide[d] no factual basis regarding how or why Verizon transferred [his] files, nor [did] he explain the factual basis for his belief that Verizon performed any transfer that may have occurred"); *Williams*, 136 F. Supp. at 593 ("[T]he plaintiff's [SCA] claim fails because it does not allege, other than in conclusory terms, that the defendants were without authorization, or exceeded their authorization to access his emails.").

Accordingly, the Court dismisses Plaintiff's SCA claim.

### c. Federal Wiretap Act claim

Defendants argue that Plaintiff fails to state a claim under the Federal Wiretap Act because she fails to demonstrate that any interceptions were done during transmission and fails to overcome exceptions under the Act. (Defs. Mem. 9.) In support of their argument, Defendants assert that the meaning of "intercept" should be "narrowly define[d] . . . to include only 'acquisitions of communications contemporaneous with transmission, not storage.'" (Defs. Mem. 12) (citation omitted).

Plaintiff alleges that at some time after she reported her computer breach in December of 2015, she noticed an "external white wire coming into her office . . . from the roof of SJU extending downward . . . [that was] visible from the outside and invisible from the inside of Plaintiff's office." (Am. Compl. ¶ 118.) She also alleges that her "cell phone data [was] being pulled from her phone while in her office" (*id.* ¶ 119), that some of her emails to McElroy were altered and intercepted, (*id.* ¶¶ 108, 122), and that someone changed her work voicemail password and deleted two voicemails without her authorization, (*id.* ¶¶ 127, 129). Plaintiff further alleges that, upon her return from FMLA leave, her calls were being forwarded via an external mechanism unfamiliar to Telecommunications, and when Plaintiff called out from her telephone, a different extension number came up on the recipient's caller identification system. (*Id.* ¶¶ 131–32.) Lastly, Plaintiff alleges that Gonzalez eavesdropped on her conversations. (*Id.* ¶ 136.)

The Wiretap Act makes it unlawful to "intentionally intercept, endeavor to intercept, or procure any other person to intercept" a wire, oral, or electronic communication, or to use the contents of any such communication "knowing or having reason to know that the information was obtained in violation of [the Act]." *See* 18 U.S.C. § 2511(1)(a), (c). Section 2520, which

provides for civil remedies for a violation of the Wiretap Act, states that "any person whose wire, oral, or electronic communication is intercepted . . . in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520; *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d at 274 (stating that a prima facie case under the Wiretap Act requires showing that the defendant "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device"); *Hall v. EarthLink Network, Inc.*, 396 F.3d 500, 503 (2d Cir. 2005) (finding that the [Wiretap Act] provides a private right of action against "anyone who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication'" (quoting § 2511(1)(a))).

"Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id*. § 2510(4). Courts in this Circuit construe the term "intercept" narrowly. *See Tantaros*, 2018 WL 2731268, at *7 ("Courts in this circuit, and elsewhere, have construed the term 'intercept' narrowly to require that the interception of an electronic communication be contemporaneous with the transmission of that communication."); *Zaratzian v. Abadir*, No. 10-CV-9049, 2014 WL 4467919, at *6 (S.D.N.Y. Sept. 2, 2014) (collecting cases), *aff'd*, 694 F. App'x 822 (2d Cir. 2017); *see also Directv, LLC v. Wright*, No. 15-CV-474, 2016 WL 3181170, at *5 (W.D.N.Y. June 3, 2016) ("[A]n interception requires a capture of the communication while it is in transit."); *Snyder v. Fantasy Interactive, Inc.*, No. 11-CV-3593, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012) ("Courts addressing the meaning of 'intercept' narrowly define it to include only 'acquisitions of communication contemporaneous with transmission, not

storage.'" (quoting *Conte v. Newsday*, Inc., 703 F. Supp. 2d 126, 139 n.11 (E.D.N.Y. 2010))).

"[A] number of courts adopting the narrow interpretation of 'interception' have specifically premised their decisions to do so on the distinction between [section] 2510's definitions of wire and electronic communications." *United States v. Smith*, 155 F.3d 1051, 1057 (9th Cir. 1998).

Although Plaintiff states that her email communications were "intercepted," she does not plead that the emails were intercepted during transmission. Instead, Plaintiff asserts generalized complaints that her emails were "altered," that Gonzalez was possibly "surveilling" her email, and that she experienced issues with her computer such as computer screens "switching" while she was in the process of drafting emails. (Am. Compl. ¶¶ 134, 137–38.) None of these allegations sufficiently state a plausible claim that any Defendant actually intercepted any of Plaintiff's communications. *See Fraser*, 352 F.3d at 110, 113–14 (finding that the employer's search of employee's email stored on central file server not interception because it was not contemporaneous with transmission); *Molefe*, 2015 WL 1312262, at *4 (dismissing wiretap claim because, notwithstanding "the technological feasibility of the activities Plaintiff allege[d], [he] fail[ed] to provide a factual basis for a finding that his phone and internet services were tapped") (internal quotation marks and citation omitted); *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 526 (S.D.N.Y. 2013) (dismissing federal Computer Fraud and Abuse Act claim where the pleadings were "couched in terms of sheer possibility, [and] conjecture"). Nor does Plaintiff allege the use of a device to intercept the email communications. *See Conte*, 703 F. Supp. 2d at 140 (dismissing the plaintiff's Wiretap Act claim where the plaintiff did not allege that a device was used to intercept communications); *Ideal Aerosmith v. Acutronic USA, Inc.*, 07-CV-1029, 2007 WL 4394447, at *4 (E.D. Pa. Dec. 13, 2007) ("The drive or server on which an email is received does not constitute a device for purposes of the Wiretap Act.").

Even assuming Gonzalez was surveilling Plaintiff's computer or had a device attached to Plaintiff's work telephone and voicemail, which allegations Plaintiff does not factually support in her pleadings, Plaintiff does not allege that Gonzalez intercepted any communication contemporaneously with the actual communication. Accordingly, Plaintiff fails to state a claim under the Wiretap Act and the Court dismisses this claim. *See, e.g.*, *Snyder*, 2012 WL 569185, at *2 (dismissing Wiretap Act claim where the plaintiff pled "no facts suggesting that Defendants accessed their communications during transmission").

### d. FMLA claim

The Court liberally construes Plaintiff's Amended Complaint to raise a FMLA claim.[14] Plaintiff alleges that, while she was on FMLA leave, Gonzalez assigned Plaintiff's clients to Murphy, and that therefore when Plaintiff returned to work she was not returned "to the same or equivalent position." (Am. Compl. ¶ 195.)

"The FMLA gives eligible employees an 'entitlement' to twelve weeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)). It "'creates a private right of action to seek both equitable relief and money damages against any employer . . .' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights." *Id.* (quoting *Nev. Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)). "The Second Circuit recognizes distinct claims of interference and retaliation under the FMLA." *Sista*, 445 F.3d at 175; *see also Woods*

---

[14] *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (per curiam) ("We liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." (alteration and internal quotation marks omitted) (quoting *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007))).

*v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) ("FMLA claims come in at least two varieties: interference and retaliation." (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004)).

Plaintiff does not specify whether she is asserting an interference or retaliation claim. However, based on her allegations, the Court construes her claim as a FMLA retaliation claim. Plaintiff alleges that she was employed at SJU for several years and that Gonzalez had Murphy "take Plaintiff's position," presumably while Plaintiff was on FMLA leave. (Am. Compl. ¶ 195.)

### i. Plaintiff's demotion and diminished duties

Plaintiff alleges that her "position was demoted," her "employer portfolio was completely dismantled," and Gonzalez and Murphy "usurped" her duties while she was on FMLA leave. (Am. Compl. ¶¶ 194–95; Pl. Opp'n 18.)

Defendants argue that these allegations as to Plaintiff's FMLA retaliation claim are belied by other allegations in her Amended Complaint because Plaintiff also alleges that Gonzalez began taking action against Plaintiff's work and clientele prior to her taking FMLA leave. (Defs. Mem. 24 (quoting Am. Compl. ¶¶ 32, 48).)

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168; *see also Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (same); *Donnelly v. Greenburg Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012) (same).

Adverse employment actions include "materially adverse change[s] in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices unique to a particular situation," or "refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225–26 (2d Cir. 2006) (internal quotation marks omitted).

Although diminished material responsibilities can be enough to show demotion, Plaintiff does not allege what her responsibilities and duties were prior to her FMLA leave and how those responsibilities and duties were altered after she returned from FMLA leave. Plaintiff only makes the conclusory allegation that her "employment portfolio" was dismantled and that Gonzalez "had taken Murphy . . . to Plaintiff's clients with the impression that . . . Murphy had taken Plaintiff's position."[15] (Am. Compl. ¶ 195.) Thus, Plaintiff's allegations are conclusory and, based on these allegations, Plaintiff fails to state a claim for FMLA retaliation. *See Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (affirming dismissal of a claim based on "wholly conclusory and inconsistent allegations").

---

[15] In addition, Plaintiff does not specify which Defendant retaliated against her. An individual may be liable as an FMLA employer if he "acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 261 (4)(A)(ii)(I); *see Graziadio v. Culinary Institute of Am.*, 817 F.3d 415, 422 (2d Cir. 2016) (finding that an individual may only be liable under the FMLA if he is an employer). The Second Circuit applies an economic-reality test in determining who is an employer under the FMLA. *Id.* (finding that under the economic-reality test, "courts ask 'whether the alleged employer possessed the power to control the worker in question, with an eye to the 'economic reality' presented by the facts of each case.'" (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999))). The Court considers a totality of factors, such as "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *RSR Sec. Servs. Ltd.*, 172 F.3d at 139). "No one of the four factors standing alone is dispositive [,] . . . [and] any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Id.* (alterations in original) (quoting *Herman*, 172 F.3d at 139). Although Gonzalez may be an employer because she managed Plaintiff's work duties and appears to have had control over Plaintiff's employment, Plaintiff does allege that Murphy engaged in any activities from which the Court can infer that he was a supervisor within the meaning of the FMLA.

### ii. Plaintiff's termination

In addition, although Plaintiff does not specifically allege that her termination was in retaliation for her taking FMLA leave, the Court nevertheless considers Plaintiff's allegations and concludes that Plaintiff has not sufficiently alleged that her termination was in retaliation for taking FMLA leave.

Although Plaintiff's termination is an adverse employment action, Plaintiff must nevertheless demonstrate that her taking FMLA leave constituted "a negative factor" in Defendants' decision to terminate her. *Woods*, 864 F.3d at 169; *see also Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (holding that the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking leave pursuant to the FMLA"). FMLA retaliation claims use a "motivating factor" causation standard. *See Woods*, 864 F.3d at 166. An inference of retaliatory intent can be established "when there is a basis for a jury to conclude that 'a causal connection [exists] between the plaintiff's protected activity and the adverse action taken by the employer.'" *Donnelly*, 691 F.3d at 152 (citing *Mack v. Otis Elevator Co.*, 326 F.3d 116, 129 (2d Cir. 2003)); *see also Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Causation in a FMLA retaliation case may be satisfied by "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also Feingold v. New York*, 366 F.3d 138, 156–57 (2d Cir. 2004) ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." (collecting cases)); *Nonnenmann v. City of New York*, 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20, 2004) ("Causation can be established either indirectly

by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

Plaintiff returned from FMLA leave in October of 2016, (Am. Compl. ¶ 133), and was terminated on March 31, 2017, approximately five months later, (*id.* ¶ 221). A five-month gap between Plaintiff taking FMLA leave and her termination is too attenuated to support causation. *See O'Reilly v. Consol. Edison Co. of N.Y., Inc.*, 173 F. App'x 20, 22 (2d Cir. 2006) ("While close temporal proximity can give rise to an inference of retaliation, the three month gap between [plaintiff]'s FMLA leave and her termination is not sufficient to give rise to an inference of retaliation in light of the additional leave time [the defendant]'s policy allowed.") (citation omitted); *see also Clark v. Stop & Shop Supermarket Co.*, No. 15-CV-304, 2016 WL 4408983, at *10 (D. Conn. Aug. 16, 2016) (finding that the plaintiff failed to show an inference of retaliation where he was terminated five months after his return from FMLA leave); *Monclova v. City of New York*, No. 12-CV-3187, 2014 WL 4828813, at *17 (E.D.N.Y. Sept. 29, 2014) (finding that "three months is a 'generally accepted' time-period for raising an inference of retaliation based on temporal proximity"); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (finding that, generally, "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation").

In addition, Plaintiff does not plausibly allege that her termination occurred under circumstances giving rise to an inference of retaliatory intent. Although Plaintiff alleges that "Murphy and other colleagues were irritated" that she returned from FMLA leave and that "personnel changes had to be made because" she was "not supposed to come back," Plaintiff does not specify when those remarks were made or who ordered personnel changes. The Court

therefore cannot reasonably infer from these allegations that Plaintiff taking FMLA leave was a "motivating factor" in the decision to terminate her employment approximately five months after she returned from leave.

The Court therefore dismisses Plaintiff's FMLA claim without prejudice.

### e.   State law claims

Having dismissed Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for negligent and intentional infliction of emotional distress, breach of contract, and defamation. *See* 28 U.S.C. § 1367(c)(3) ("District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."); *see also All. of. Auto. Mfrs., Inc., v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015) (holding that it was "not improper for the court to decline to exercise its supplemental jurisdiction" after it properly dismissed the plaintiff's federal claims); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (alteration in original) (quoting *Castellano v. Bd. of Trs.*, 937 F.3d 752, 758 (2d Cir. 1991))).

Accordingly, the Court dismisses Plaintiff's state law claims without prejudice.

### f.   Leave to amend

In light of Plaintiff's *pro se* status, the Court grants Plaintiff leave to file a second amended complaint within thirty (30) days of this Memorandum and Order. Any further amended complaint should specify who accessed any stored communications without authorization and who intercepted any of Plaintiff's communications while those communications were in transit, without authorization. In addition, Plaintiff must specify against

whom she brings an FMLA claim and whether said individual(s) exercised sufficient control over her employment. Plaintiff must also provide sufficient factual allegations for the Court to evaluate whether Defendants retaliated against her for taking FMLA leave. Plaintiff may re-plead her state law claims in any amended complaint.

A second amended complaint completely replaces the prior complaints filed in this action and must be captioned "Second Amended Complaint" and bear the same docket number as this Memorandum and Order. Plaintiff must succinctly state all of her claims against each defendant whom she believes directly violated her rights, and do so in accordance with the instructions noted above.

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion and dismisses Plaintiff's Amended Complaint in its entirety for failure to state a claim on which relief may be granted. The Court grants Plaintiff leave to file a second amended complaint within thirty (30) days of this Memorandum and Order.

Dated: March 26, 2019
      Brooklyn, New York

                                          SO ORDERED:


                                          _____s/ MKB_____
                                          MARGO K. BRODIE
                                          United States District Judge